Well, thank you, Greg. I appreciate it. And good morning to you, counsel. We're happy to have you on this new medium. I think Zoom is interesting. We're having fun with it. It's our first, my first voyage on Zoom with relation to oral argument. So let's begin with appellant. And please let me know how much time you'd like to reserve. Thank you, Your Honor. Robert Burgoyne for the National Board of Medical Examiners. And I would like to reserve five minutes for rebuttal. Very well, sir. Go ahead. Thank you so much. Thank you. And it's my first time with Zoom as well. So fingers crossed. This case presents important questions regarding the meaning of the Americans with Disabilities Act and who's disabled under the act in the context of standardized tests administered to an individual for a licensing examination. The issue arises frequently in litigation. And so the outcome of this appeal is important, not just for the parties here, but for other parties as well. The lower court awarded a preliminary injunction to Jessica Ramsey that gave her double testing time on step one of the licensing exam for doctors. It also awarded her double testing time on every subsequent step exam, even though she won't be taking at least one of those examinations for two years. Mr. Burgoyne, what is the standard, our reviewing standard here with respect to what the district court did? Your Honor, your standard of review for the ultimate decision, which involved the application of law to facts, is de novo. So ultimately on the core question of whether or not Ms. Ramsey is disabled under the ADA, it's de novo plenary review. But isn't it really abuse of discretion? And don't we have a situation where Judge Joyner credited the numerous experts who had tested and performed diagnostic tests on Ms. Ramsey finding, especially Dr. Smith, that her reading speed and efficiency and comprehension put her in a substantially limited category. He credited them against your experts who never even met her, let alone performed any test whatsoever. How do we say that that's an abuse of discretion? Well, it's an abuse of discretion at a few levels, Your Honor. In the first place, the application of an improper legal standard is by definition an abuse of discretion. Here, the judge never made a finding that she's substantially limited in her ability to read or concentrate compared to most people in the general population. Well, he did because he indicated what the test is for disability as compared to the general population and then found it. Does he have to say an oh, by the way, in finding that she meets the definition, I want to note that it really is related to the general population? And didn't Dr. Smith's percentile determination actually conclude that this had to do with the population? No, Your Honor, he didn't. Dr. Smith remarkably never testified that compared to the general population, Ms. Ramsey's reading abilities are substantially limited. What he found was on three- Didn't he actually find, at least in three categories, that she was below the fifth percentile as compared to others of her age? And isn't that consideration consistent with how one judges how a learning disability is examined in context of the general population, which includes considering their age, whether they have age-appropriate education and the like. So following up on Judge Rundell just said about Dr. Smith, isn't it a fact that right before this district court, it had hard data that it adopted as being credible to conclude that, in fact, her circumstances are different than the general population when considering things like age, education, and the like? What the district court had in front of it was results on three subtests administered by Dr. Smith, which yielded results that, as other experts testified, were grossly inconsistent with her performance on every other standardized test she's ever taken. Dr. Smith acknowledged that nowhere in Ms. Ramsey's 20-year history of taking standardized tests were there any deficits comparable to what he identified on those three subtests. But we have the, the district court had in front of us in Dr. Lewandowski's views that her intellectual neurocognitive and studies were, as the district court said, abnormal or borderline abnormal, that Dr. Ruckberg talked about abnormal scanning and processing speed, which is akin to, it seems, some of the conclusions that Dr. Smith reached. So didn't the district court have sufficient evidence in front of it such that it did not clearly earn its conclusion about her condition as compared to others in the population? With respect, Your Honor, and tying back to a question Judge Rendell asked, because it relates to what you just asked, the only evaluation report that the plaintiff relied on in seeking, initially seeking her preliminary injunction was Dr. Smith. Although the district court indicated at one point in his decision that Dr. Lewandowski, Dr. Ruckberg, Dr. Houtman, Dr. Smy performed diagnostic testing and reached the same conclusions, that's not accurate. Dr. Ruckberg didn't perform any diagnostic testing. Mr. Dr. Smy performed no diagnostic testing. The first person to diagnose her with dyslexia was Dr. Smith. None of the others, in fact, diagnosed her with dyslexia. Dr. Smith said Drs. Lewandowski, Livingston, and Smy all reached conclusions that were inconsistent with and couldn't be supported under the DSM-5 diagnostic criteria. So at the end of the day, what you're left with is Ms. Ramsey's performance on three diagnostic subtests, which conflict with a lifetime of average or better than average performance on standardized tests, including as well, her academic performance across high school, college, and also while she's doing a lot of things extracurricular. Well- You did not do anything to discredit Dr. Smith. There's no real kind of chipping away at what he did. Neither of your experts really had an issue with what he did. That's not correct, Your Honor, and this is an important distinction. What they said was he administered, the tests that he administered were appropriate tests. Right. And they didn't doubt that the results that he achieved were consistent with how Ms. Ramsey performed. None of our experts testified that the results were valid and credible, and the district court's contrary finding was clearly erroneous and inconsistent, correct? What did your experts do in order to help us determine that they were invalid or incredible? Oh, we have nothing that would cause us to doubt them other than the continued assertion that it's not like a real world test, like the ACT or the MCAT. But those are not diagnostic tests. Seems to me, if your experts had diagnosed her, had met with her, had done testing that was totally inconsistent with what Dr. Smith did, that would be one thing, but we don't have that. We have them attempting to critique without any firsthand knowledge and not telling us how to undermine what we have. Yeah, Your Honor, thousands and thousands of people request accommodations every year on standardized tests. If the proposition is that a standardized testing company has to personally evaluate every individual seeking accommodations, the process would grind to a halt. That's not realistic. It's not contemplated under the ADA. This is no different than any number of other contexts where external professionals review documentation. But we do have the regulations here. The regulations are very clear. The regulations say reports from experts who have personal familiarity with the candidate should take precedence over those from reviewers for testing agencies who have not personally met with the candidate or conducted the requisite assessments for diagnosis and treatment. Now that's out of the regs. So the regs obviously contemplate not looking at the conclusions of people who have personally seen a test taker as opposed to those who are theorizing. So I understand the predicament that you're reciting to us about the realistic possibility of trying to have personal contact with everyone who asks, but everyone who asks doesn't file a lawsuit. That is true, Your Honor, fortunately. The fact is, Your Honor, in the first place, I don't believe those are the regulations, Your Honor's reading from. I believe they're guidance statements made by the agency. And the regulation, and we also appointed the court to a settlement agreement, which the Department of Justice reached with our client, which made clear we don't have to give precedence to the examinees professional, that we have the right to review academic history, and that we have the right to obtain independent external review of what the examinee's professional reports to us. Well, that's all- But is it an abusive discretion for a court to credit the examiners as compared to those who have not examined her? Well, a court can certainly make that determination. I don't think that was a determination made by the court below, Your Honor. I mean, at the end of the day- Go ahead, I'm sorry, Judge. No, no, no, go ahead. I was just gonna say, at the end of the day, we have two varied decisions out of the Eastern District of Pennsylvania. We have Judge Delzell's decision in the Bibber case, and then we have Judge Joyner's decision in this case, both post-ADA Amendments Act, both with individuals with dyslexia, diagnosed dyslexia, both with extensive academic histories, which- These cases are extremely fact-specific. They're not apples and apples. They are credibly fact-specific, Your Honor, although I would submit that Judge Bibber's, or the Bibber decision and this case are about as close factually as one could come with a qualification that Ms. Bibber, in fact, presented a far more compelling case of being disabled, and where, at the end of the day, the court, in that case, correctly said, what we have to do is provide, apply the standard substantially limited compared to most people in the general population. And the court did that in that case, saying it was an admittedly difficult thing, but there, you had a plaintiff who had a lifetime of accommodations. The court here said Ms. Ramsey had informal accommodations. That was, in fact, inconsistent with much of the record. She had extensive accommodations throughout her history, Ms. Bibber did, unlike Ms. Ramsey. And at the end of the day, the judge, in that case, in our view, correctly said, we can't ignore this lifetime of performance in other contexts where reading and concentration are necessarily required in order to do well. And you have that here. You cannot perform at the 97th percentile on the ACT College Admission Test, and then come out and perform at the first percentile level on a test that requires you to read sentences, such as, the cat is on the roof. But what we do know is that she's got extraordinary percentile performances in mathematics, and markedly different performances in reading. And so her ACT score is not necessarily a barometer of her reading score. It's a combination of skills. So I'm not sure that advances very well here. But I did wanna ask you, or follow up on something Judge Greenaway said. You mentioned that what Judge Greenaway was talking about when it came to giving precedence to those who've done personal examinations of the applicant for accommodation to the board. There was commentary, and it comes from the preamble to the regulations. But after the proposed rule was issued, there was commentary and the regulators said, we're still gonna embrace this view. So this settlement that you're talking about, what is that about? What impact does it have on the regulatory scheme? When was the settlement? Your Honor, the Department of Justice is the enforcing agency here. They relied on informal guidance from the Department of Justice regarding, you should give extra weight to the candidate's evaluator. We pointed out the Department of Justice has said, there can be no legal obligations on regulated parties beyond what are in the statute and the regulations. And then we pointed out that the Department of Justice has said directly in defining the obligations of the National Board of Medical Examiners, you are not required. When was that settlement? What was the year? That was 2011, Your Honor, and the ADA Amendments Act was 2008. Thank you. The next question I have though, is going back to the very first question, Judge Rundell was, Sarah's questions was, even if we put aside the regulatory scheme, we'll assume it didn't exist. Like any other judicial decision on facts, fact finding and credibility and weight are issues that we have to give great deference to the district court. So even if this regulation played no role or didn't exist or was totally wrong, how can we say the district court abused its discretion to give more credit to those who examined a person as compared to those who did a paper review and no independent diagnosis? How can we say that's an abuse of discretion in terms of purely weighing the evidence? Your Honor, I don't think the lower court did weigh the evidence. I don't think at the end of the day he was making credibility determinations relative to Dr. Smith's findings and the testimony from our experts or relative to the balance of the record. What he said was that he was constrained that we were constrained not to go in and evaluate whether or not she was in fact disabled within the meaning of the ADA, on an issue which was an issue that Dr. Smith never testified to. He never testified that she's substantially limited compared to most people in the general population. And at the end of the day, that is a law to facts issue. And if the court did not apply the correct legal standard, which we submit it didn't, then that should be the end of the matter. But he did focus at the bottom of page 53 and that 52 and 53, he said, these, we note that these people, Lovett and Zecker, never saw her, never diagnosed her. They looked at her record of academic performance through her school years, standardized tests. He definitely weighed the evidence. Well, he took them to task for not personally, or he said they should be given less weight because they didn't personally evaluate her. But there's nothing in the regulations that requires that, that they have personally evaluated or nothing in the regulations that says the candidates review against presidents and nothing that would minimize our right to go in and do the external review. Let me ask you this question. Given the fact that Ms. Ramsey has passed step one with accommodations, if we agree with the board that the preliminary injunction was improvidently granted, does she have to do a retake as it were of step one or would this be prospective as to step two and step three? Well, it would certainly be at least the latter, your honor. In our view, the appropriate thing would be for her to retake step one, which she simply had to take by March 1st. But I suppose that could be part of the court's analysis. Okay, thank you. Briefly on the second factor, the second gateway factor irreparable harm, there was a single fact finding by the district court in support of irreparable harm. That was that she had to take and pass step one by March 2nd. There's no dispute that that was not the case. All she had to do was take step one by March 2nd. Therefore, the district court's sole finding on irreparable harm was clearly erroneous. We don't dispute on that issue that it is a clearly erroneous standard. How does that apply to step two and step three, the irreparable harm aspect? Well, your honor, that was one of the more curious aspects of his decision. We didn't understand why he reached out to exams, one of which she's not gonna be taking for two years. There was nothing from her school that addressed the question of when she had to take the remaining step exams. So in fact, the court never should have reached those additional examinations. The only issue before the court was whether or not she had to take, the only proper issue is whether she had to take step one prior to March 2nd. So you would want us to vacate that aspect and then you'd have another round of battles with her when she takes those tests. Is that the idea? Well, your honor, we think on the record before the court, she's not disabled within the meaning of the idea. So we hope we don't have another round of battles with her. Well, you will have a battle if she says she is and you say she isn't, correct? We will, your honor, all of us guided by the court's opinion. But again, we're here on a mandatory preliminary injunction, which if words have meaning, is supposed to be a drastic and extraordinary remedy as to which her burden was even higher because it was a mandatory injunction. Well, we didn't have discovery. For example, Judge Joyner gave great credence to Dr. Rookberg and referred to him as having provided diagnosis and evaluation as well as an evaluation report. And we never deposed him, but clearly even on the basis of the record we had, we confirmed that he was not in fact a diagnosing professional. He didn't prepare a report. He was Ms. Ramsey's psychiatrist and he wrote a letter of support, which when he wrote it started at two pages and when she was done editing it, ended up at nine pages, drastically different from the original version. I'm curious about your concern for the fairness and integrity of the test. It would seem to me you want to make sure that people who take this test are qualified to be doctors. And it would seem to me if someone needs an accommodation in order to be able to present themselves and answer the test to show that they are indeed qualified, that that should be something you would want to encourage as compared to discourage. Your Honor, we don't discourage. The reality is that standardized tests are standardized for a reason. And virtually every examinee would welcome the opportunity to test with extra testing time, to test in a private testing room, to test with granola bars, to test with testing over two days instead of one. But that at the end of the day fundamentally alters what a standardized test is. It isn't fair for a given examinee to get those non-standardized testing conditions if in fact they do not meet the ADA definition of disability. But you would agree though, if they do meet it, they are entitled by law to an accommodation, correct? We have, we give out thousands of accommodations in our history, Your Honor. It's not- And you've done it here. You gave her accommodations except for the double time. Well, here we gave her extensive accommodations which she never chose to test with, including testing over two days and testing in a private room, the ability to stand and talk if she's inclined to do so, any number of accommodations. She didn't want that. What she wanted was the additional testing time and time that certainly her record suggests it doesn't need if we look at how she did on the directly comparable MCAT exam, which is a five plus hour computer-based exam and how she did on the ACT exam, which is a reading intensive exam where, to your point, Judge Schwartz, she scored in the 98th percentile on one of her reading related components on the ACT exam. It wasn't a question of her math score catapulting her to the 97th percentile. She did well across the board, including on the reading section. Very good. Thank you. Thank you, Your Honor. I'm sure my time is long expired. Thank you. That is a true statement, but no worries. Counsel, let's have counsel for appellees, please. May it please the court. My name is Mary Vargas and along with Larry Berger and Michael Stein, I represent Jessica Ramsey, the plaintiff appellee in this case. Ms. Ramsey is a gifted medical student who needs extended time on testing as the result of lifelong and significant challenges with reading and attention. The National Board of Medical Examiners asked this court to disregard all of the factual findings of the district court and instead find as a matter of law that a medical student who performed on standardized tests, such as the ACT or the MCAT, using mitigating strategies is somehow disqualified from coverage under the Americans with Disabilities Act. What were her mitigating strategies on the ACT and MCAT? The argument that your adversary makes, or one of the key arguments, is that they believe she's not disabled because your experts say she is, but in their evaluations, so says your adversaries, they say she's substantially, she doesn't, they don't say she is substantially impaired in comparison to the general population. Why isn't that absence, if it's true, a disqualifying omission? Well, I would say the determination of whether somebody has a disability, particularly in this, as in this case, where someone's entire future is on the line, is not a matter of gotcha or using the magic words. The district court listened to three days of testimony, including detailed testimony from Dr. Smith, which the district court credited about what he observed in his testing of Ms. Ramsey, what he concluded based on review of her report cards and her standardized testing, what he concluded based on his interviews with her mother and his interviews with her. And this is someone who is an expert in dyslexia. And so while I would say that it's the court's decision to decide whether somebody has a disability, Dr. Smith did what his job was. He evaluated her as experts in dyslexia do, using all of the available information, which was very significant. Well, my question is- I don't think you're answering Judge Greenaway's question. Exactly, thank you. I'm gonna follow up. So my question is, in those evaluations, credit to the doctors for being thorough, did they answer the question that your adversary is posing, which is, did they conclude based on these extensive tests and opportunities to be with her, that she was substantially impaired in comparison to the general population? And if so, where did they say that? It's not a gotcha moment. Agreed, that's not what we're about. But what did they say that you would say captures the essence of that? Yes, Your Honor. Dr. Smith reported that Ms. Ramsey had 132 IQ, but that in his test administrations of her, she performed in the first percentile, so worse than 99% of the general population on reading fluency on the WIAT-III. Her reading rate cluster score, according to Dr. Smith, was at the first percentile on the Woodcock-Johnson core. On the GORT-V, in reading fluency, Dr. Smith stated in his testimony and provided documentation in his report that Ms. Ramsey performed at the second percentile for reading fluency, and that on the Nelson-Denny, which admittedly is a relatively short test, but it's a short test for everyone, that Ms. Ramsey was only able to even attempt 47% of the questions using standard time. Then in his testimony before the district court, he walked the court through the kinds of informal accommodations that she required and the way her relationship with reading and attention is substantially impaired and distinct from the way the rest of us deal with reading, for example. But how can you reconcile that with the MCAT and the ACT? And I think you said at the outset that she used mitigating measures, and Judge Schwartz was asking you about that. How do we have, how do you reconcile this? I mean, it's not like she was a 20 percentile. She was one percentile versus whizzing through the MCAT and the ACT and doing well on other standardized tests. How do you explain that? That was a question that was addressed extensively in the testimony at the district court. Ms. Ramsey herself testified in detail about the strategy she used specifically on the MCAT in order to answer the questions while minimizing any reading she had to do. She worked using sample MCAT questions in her testimony. She explained how she skipped the reading passages and focused only on answering the questions. She then testified how that strategy does not work on step one or beyond. The USMLE requires reading in a way that the MCAT doesn't. And while many of us would not approach the MCAT in the way that she did, the way she approached the MCAT of minimizing reading is something that was necessary for her as a byproduct of a very significant limitation in the ability to read. She also offered testimony in the district court where she explained that words don't actually have meaning to her like they do to other people. And in order to give those words meaning, she utilizes colored pencils and colors in a very detailed system of giving a color meaning to a word. That's not something that, certainly in the degree that she testified, that's not something that your average student or person would need to do when she reads. So it was very important how she took those tests. In addition to that, the NBMEs evaluators, their outside consultants who looked at her records and her evaluations, they admitted in their testimony that the MCAT and the ACT are not diagnostic testing. While Dr. Farmer, the person who determined that accommodations weren't going to be provided for the NBMEs, she said this was all just a matter of common sense. It's actually not. There are experts in dyslexia who offered, in this case, testimony that the way a person with dyslexia interacts with these tests and with reading is not like other people. Well, let me ask you just as a follow-up. The district court, Judge Joyner, pardon me, in his opinion said, certainly in comparison to the average individual in the general population, plaintiff appears to have been and continues to be quite successful in her endeavors, which obviously she's attained some success, but that seems the exact opposite or antithetical to the notion that she's substantially impaired to the general population. I know you recited the test results where she's in the first and second percentile, but I think that's an interesting follow-up to Judge Rendell's question. And how are we to balance that conclusion by the court with this standard that we have to apply of being substantially impaired in comparison to the general population? Well, Your Honor, the NBME in its reply brief raised that point. And what it said, I believe it was around page 41 of the NBME's reply brief. They said that her being successful should have doomed her claim under the ADA. I would say that everything in the ADA and its regulations directly contradicts that claim. The ADA is not about people having to fail in order to earn some kind of accommodation. We can look at Stephen Hawking or Thomas Edison or any number of, George Bush, any number of people who achieved success in their life, but how they did so and what disabilities they had to overcome. The time, manner, and duration and how they performed, in the case of someone with dyslexia, reading, that's the measure. It's not whether somebody overcame, it's whether they have a disability. And if I could ask you as a follow-up to this, on the issue of measuring her in comparison to the most people in the general population, what is the proper standard to articulate when we're talking about in a learning disability case? And second, what was before the district court that would allow us to understand that it made that comparison? Because your adversary says that comparison was not made and that was error. Well, in the learning disability context, that was highly significant in passage of the ADA Amendments Act, where there was specific language by the congressional committees addressing how people with learning disabilities were still satisfied the definition of disability despite success. And that the passage of the ADA Amendments Act was intended to address that distinction. In looking at somebody with dyslexia and trying to figure out whether or not they're an individual with a disability, first, you have to recognize the statute says this isn't supposed to demand extensive analysis. What we're doing here is the antithesis of what the statute instructs we're supposed to do to determine disability. In figuring out whether this student with dyslexia qualifies as having a substantial impairment, that's a credibility determination that the district court made based on- But that's not what I'm asking. I'm asking about the legal standard. Because the best guidance that I could find comes from the federal register. And it talks about how do you evaluate who this general population is for the purposes of someone who's got a learning disability as compared to someone who has maybe a physical impairment of some sort. And it says that you could find a disability where the impairment has been clinically diagnosed based upon a disparity between the individual's aptitude, actual and expected achievement, taking into account their age, measured intelligence, and age-appropriate education. I haven't heard that from you, but do you have any other standard that the district court is supposed to apply to know who's in the most people in the general population when you're doing it for a learning disability case? And then secondarily, what did the district court do to tell us that it made that analysis? Well, with respect to learning disabilities, it's particularly important to look at the time, manner, and duration, the condition of how somebody reads. How is Ms. Ramsey's relationship with reading? What does she actually do when she reads? How is that different from the general population? When Ms. Ramsey reads, she testified that it's something that she struggles with. When Game of Thrones was the book everybody that was reading, she testified that she couldn't read it herself. In order to understand and enjoy the book, she went to a friend's house and they actually read it to her. But my question is, that's not really what I'm asking. I'm trying to get a sense of who's her comparator. Is it people of like age with like education? Is it something different? And putting that, once we figure out what that is, tell me where in the record it tells me the district court made a conclusion or had evidence in front of it to conclude that she was limited in comparison to most people in the general population as defined by those with a learning disability. Right, I think the general population means exactly what it sounds like. It means how does the general population function in reading as compared to her? I don't- Well, you can't possibly mean that because a five-year-old is gonna read differently than a 28-year-old who went to college, right? Well, there's some recognition of that in, I believe it's in the regulations where they say that obviously someone who's five would read differently than someone who's 25. But I don't think comparison of the general population necessarily says that you have to take a 27-year-old plaintiff and compare it to some mythical 27-year-old person. I think it's just a more general understanding of how the general public relates to reading. And is what she does, is that different? And then pulling back to the second part of your question, which is where in the district court opinion the judge does this, I believe in some of the footnotes, it might be footnote 10, for example, where Judge Joyner provided some examples of, I believe it was footnote 10, of how she reads and some of the accommodations that she needed in order to do what her classmates were doing. And while she didn't receive formal accommodations in her early education, the judge credited that she did receive fairly broad informal accommodations, including things like extended testing time, including things like being graded on the parts of projects and tests that she finished, being able to, she was brought in at recess where other kids weren't. And so the judge- I haven't asked about accommodation. I'm asking about what's in the record that would let the district court know that she is not like those in the general population. Aside from Dr. Smith's analysis, what other evidence did the district court have in front of it to conclude she was unlike them? Is there diagnostic evidence or is your position the accommodations themselves demonstrate she's different because she needed to use these mitigation strategies? There certainly was other diagnostic evidence. Every doctor who ever evaluated her concluded that she needed extended time because of substantial impairments, every single one. While it was Dr. Smith who ultimately put his finger on the fact that it was dyslexia, the record goes all the way back to second grade and even first grade where it was documented in first grade that she was reversing letters, in second grade that she was reversing letters, in second grade that she was already, despite having an IQ of 132, she was performing two years behind her classmates. She was referred out for testing. And I think we all wish that when she was referred out for testing, she was referred to an expert in dyslexia. She wasn't. She was referred to an optometrist and the optometrist recognized that there were perceptual issues that remained after attempts at remediation. In sixth grade on her achievement tests, the discrepancy in her performance versus her potential was noticed. Dr. Halpin sent a letter to the NVME supporting Ms. Ramsey's request for accommodation. And that was from a unique perspective. That doctor was both a treating source and a professor in medical school who saw her functioning in a time when she was motivated to do her very best. And Dr. Halpin, in the record, explained that she'd seen her struggle. She'd seen her have difficulty with attention and focus and reading. So there's evidence at all levels throughout growing up all the way through certainly college and medical school. And it was in college when she finally was first diagnosed with disabilities. And I think it's very significant that that came not because she was some savvy kid who knew what accommodations were out there. It came because she was studying all the time. The medical records reflect that she wasn't eating or sleeping or cleaning or paying her bills. Everything was sacrificed to try and take in the material at college. And she still was not able on her tests to show what her professors recognized she knew. So it was two of her college professors, which I think is fairly unusual, who said to her, you need to go to disability services. So at every stage of her education, folks noticed that what she was doing was not like what other students were doing, despite the fact that she was trying very hard. And yes, she was getting good grades. But that was not without cost.  Ms. Vargas, your opponent talks about the Biver case as something that really should control here. What do you have to say about that? Well, I agree with what your honor said, that these are ultimately all very individualized fact determinations. But if we're going to compare Bernadette Biver to Jessica Ramsey, there are some key differences. It's not surprising that Bernadette Biver got accommodations that were formal early in her education because she was deaf. She was taking extended time because of other disabilities, not because she was deaf. And there was testimony from Bernadette Biver that she was an avid reader. She loved to read. And all of her reading scores were average. That is very different factually from the record that we have here, where Jessica Ramsey's reading fluency and rate and comprehension scores were anything but average. They were substantially distinct and limited as to the average level. And how about the injunction regarding step two and three? Well, how is there reparable harm there? So if I could step back in that question to step one, because in Mr. Berboin's opening, he talked about the fact that there was no evidence that she had to take and pass. There was evidence that she had to take and pass step one by March 2nd, 2020, or she could not continue in her medical education. She would either be kicked out of school or she could withdraw. Either way, once she wasn't in good standing, she could not take step one at all. Now, with respect to step two and three, what's really critical is that the NBME is only challenging one aspect of the usual determination of the ADA in this case. They're not challenging whether the accommodations she's requested are reasonable, which could conceivably change from one test to another. They're only challenging whether she's disabled. If the court finds, as it did, that she was disabled with respect to step one, she would, by definition, be disabled with respect to step two and three. In terms of when she takes step two, she is currently scheduled to take step two in August, August, 2020. And so, obviously, if the court found that she was disabled and needed accommodations on step one, and there was evidence the court credited that she faced loss of her career if she didn't take and pass the test by March 2nd, then that same determination of disability would dictate accommodations on step two and three. And ultimately, again, what we are doing here is exactly what Congress sought to short circuit, what the statute and the regulations and the guidance all say we're not supposed to do. We're not supposed to go into extensive analysis of whether a person has a disability or not. Thank you. Thank you. Judge Swartz? I'm fine, thank you. And Judge Rendell? Nothing further. Okay. Thank you very much, counsel. We'll hear appellant on rebuttal, please. Counsel, if you can hear me, this is Gregory Cain. You will need to unmute your end, please. That got me? Can you hear me now, your honor? Yes, sir. Okay, thank you. My apologies. There was discussion about Vibber and Vibber being factually distinctive. In fact, Ms. Vibber was deaf, but she was also diagnosed with dyslexia, and it was on the strength of her dyslexia that she had received accommodations for much of her life. There was this discussion of every doctor over the course of her life Jessica Ramsey's life, identifying her as needing accommodations. That was information provided to you by opposing counsel in response to the question, where was the evidence of substantial limitation compared to most people? In fact, none of those doctors, like Dr. Smith, none of them addressed the question of substantial limitation compared to most people in the general population. The interesting thing about those other diagnoses, and it ties back to the question of, shouldn't we defer to the evaluating professional? Take Dr. Lewandowski. He's a neuropsychologist, qualified, personally evaluated Ms. Ramsey, and Dr. Smith testified the testing he did was inadequate, wouldn't have supported a DSM-5 criteria analysis, wouldn't support accommodations. There was a discussion of whether or not she was able to take mitigating measures on the ACT and MCAT exam. Ms. Ramsey testified at trial that many of the questions could be answered on both of those exams without reading and gathering information from the passages. In fact, what the ACT manual tells students is before you answer questions, read the entire question thoroughly. It's important that you read every sentence before you answer the questions. The MCAT manual has the same instructions to candidates. You don't answer those questions without reading the entire passage. Dr. Smith, our testifying expert below, testified that you need basic reading skills to perform on the ACT and the MCAT. He also testified that when he's doing an evaluation, he looks at standardized test results precisely because one's ability to perform on tests like the ACT and the MCAT necessarily reflect your ability to process information, to decode, to do all of the things that, according to his diagnostic subscores, she's performing at the level of a elementary school student. There's just a fundamental disconnect there between two decades of objective evidence and the testimony she provided at trial. There was a statement again that she was receiving informal accommodations and that explains how it is she got all these wonderful grades and did so well on standardized tests. That's not accurate. When she first applied for accommodations to the NVME in 2016, she was asked to identify previous accommodations. She identified a single set of accommodations received in one elementary school year. Against that, we have, as I say, two decades of evidence. If you look at her school records, you will see there are at least 45 teachers over the course of her K through 12 education had an opportunity to grade her and to fill out reports on whether or not there were issues in class and whether or not she was performing at the level expected. She got mostly A's, a handful of B's, and no one ever indicated that there were any attentional issues or issues with concentration. If, in fact, she was struggling and had severe impairments at the level that she described in her testimony, those would have surfaced at some point across that educational continuum. Your Honor, we finally would just ask the court to compare the different questions. The questions she's seeing on the Step 1 exam are shorter than anything she saw on the Act, shorter than anything she saw on the MCAT exam, and can certainly be answered and read as easily as anything she's encountered previously. Respectfully ask the court to vacate the preliminary injunction and to send the case back to the district. All right, thank you very much, counsel. We will take the matter under advisement. Thank you for your arguments today, of course. Did you have more, Judge Rendell? Thank you, Your Honors. Okay, be well. Thank you. You too. Bye-bye. Bye.